**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN PAUL DIROSA | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 7243 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, John DiRosa, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§423(d)(2). Mr. DiRosa asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Mr. DiRosa applied for DIB on April 24, 2006, alleging that he had been disabled since May 10, 2004, due to discogenic and degenerative disorders of the back and affective mood disorders. (Administrative Record ("R.") 96). His application was denied initially on September 14, 2006 (R.105-09), and upon reconsideration on November 9, 2006. (R. 111-13). Mr. DiRosa then filed a timely request for a hearing in pursuit of his claim on November 30, 2006. (R. 114).

The administrative law judge ("ALJ") convened a hearing on March 18, 2009, at which Mr. DiRosa, represented by counsel, appeared and testified. (R. 49-94). At this hearing, Dennis

Gustafson testified as a vocational expert ("VE"). (R. 49). Mr. DiRosa and his attorney had planned on having Mrs. DiRosa testify as well, but after an off-the-record discussion, she did not testify. (R. 85). On August 31, 2009, the ALJ issued an unfavorable decision, denying Mr. DiRosa's application for DIB because he was not under a disability within the meaning of the Act. (R. 29). In making this decision, the ALJ went through the five-step sequential evaluation process to determine whether a claimant is disabled. (R. 30). 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009).

The ALJ found that, while Mr. DiRosa's impairments may be expected to cause the alleged symptoms, the statements that he made regarding the intensity, persistence, and limiting effects of the impairments were not credible when considered with the residual functional capacity assessment ("RFC"). (R. 38). The ALJ concluded that Mr. DiRosa could engage in a limited range of light work that involves simple routine tasks. (R. 37). The ALJ's decision became the Commissioner's final decision on September 10, 2010, when the Appeals Council denied Mr. DiRosa's request for review of the August 31, 2009, decision. (R. 1-3). See 20 C.F.R. §§404.955; 404.981. Mr. DiRosa appealed that decision by filing suit in this Court under 42 U.S.C. §405(g), and both parties consented to jurisdiction of a magistrate judge pursuant to 28 U.S.C. §636(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Mr. DiRosa was born on January 12, 1960, making him forty-nine years old at the time of the ALJ's decision. (R. 53,153). He is 5'8 feet tall and weighs 259 pounds. (R. 53). Mr. DiRosa attended school through the tenth grade, and he has his GED. (R. 60). He was employed at a

veteran's home for four years prior to the hearing, during which time he was a cook and then a housekeeper. (R. 55). He was injured at his job in May of 2004 when he attempted to take a TV off of the wall, and it fell on top of his neck and shoulder. (R. 56). This employment ended in 2004 on the date of his injury. (R. 55). Following this injury, Mr. DiRosa has received weekly benefits from worker's compensation. (R. 57).

## B.
## The Medical Evidence

Mr. DiRosa contends that he is eligible for DIB due to discogenic and degenerative disorders of his back. (Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memorandum"), at 2). Additionally, he contends that his diabetes and depression diagnosis should be considered along with his medical impairments. (Plaintiff's Memorandum, at 2). After his injury in 2004, Mr. DiRosa had several surgeries to alleviate the pain of his injury, including a C6-7 decompression and anterior fusion, a right shoulder arthroscopy and subcromial decompression, and a disc clavicle excision. (R. 320-348, R. 716-760).

Following Mr. DiRosa's most recent surgery in January of 2006, a diagnostic and surgical arthroscopy, he still reported having pain in his right shoulder. (R.973-76). His doctor at the time, Dr. Mark Kelly, noted that he was making "no progress at all with his therapy and having difficulty with activities of daily living" in April of 2006. (R. 976). In a progress note by another doctor, Dr. Linda Li, that was made in July of 2006, she noted that he had recurrent pain that occurred particularly in his right shoulder. (R. 1072). In August of 2006, Dr. Phillip Budzenski performed an evaluation of Mr. DiRosa and concluded that it would not be appropriate for him to have a job that required extended range of motion of his cervical spine or required him to do overhead lifting, but that he should be able to do medium work for eight hours each day. Additionally, he noted that he

3

would not have him climb ladders, scaffolding, or ropes, or work around unprotected heights. (R. 1090). Also in August of 2006, Dr. Mark B. Langgut performed an evaluation of Mr. DiRosa and diagnosed him as having moderate to severe Major Depressive Disorder.

At the request of the Agency, Dr. Delano Zimmerman completed a physical residual functional capacity assessment ("RFC") on August 30, 2006, reviewing all of the medical records submitted by Mr. DiRosa in support of his application for DIB. (R. 1095-1102). Dr. Zimmerman concluded that Mr. DiRosa could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk about six hours in an eight-hour work day, sit about six hours in an eight-hour work day, and push and pull without limits. (R. 1096). He also concluded that Mr. DiRosa should have the postural limitations of only occasionally crawling or climbing ramps and stairs, and never climbing ladders, ropes, or scaffolds. (R. 1097). Mr. DiRosa was also limited in reaching in all directions, but had no visual limitations. (R. 1098). For his environmental limitations, Mr. DiRosa was limited to avoiding extreme cold, vibration, and hazards. (R. 1099).

The physical RFC completed by Dr. Zimmerman was followed by a mental RFC completed by Dr. Phyllis Brister on September 13, 2006. (R. 1119). Through this assessment, Dr. Brister concluded that Mr. DiRosa was moderately limited in his ability to understand and remember detailed instructions, his ability to carry out detailed instructions, his ability to maintain attention and concentration for extended periods, and his ability to work in coordination with or in proximity to others without being distracted by them. (R. 1117). Both the mental and physical RFC decisions were affirmed by Dr. Ramakrishna Madala and Dr. Joseph Mehr on November 6, 2006. (R. 1242-44).

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

An ALJ held an administrative hearing on March 18, 2009, at which Mr. DiRosa testified. (R.49-94). Mr. DiRosa testified that, in May of 2004, he was injured in the course of his employment when a TV fell on top of him and landed on his neck and shoulder. (R. 56). He stated that he is constantly in pain and he has been "liv[ing] with the pain twenty-four-seven for four years." When asked what his pain level was on a regular basis, Mr. DiRosa replied that it was "between four to six." (R. 71). He explained that it was better for him to sit up than to lie down because it was more steady, and he was less likely to turn on his right side. (R. 74). He stated that he could sit up on a regular basis for twenty minutes to a half hour at a time before he experienced problems. (R. 75). Due to the pain, he was frequently awake until three in the morning and then napped on and off throughout the day. (R. 83-84).

Mr. DiRosa testified that he takes insulin, Valium, and Perocet to dull the pain of his impairments (R. 60-61). He stated that, as a side effect of these medications, he feels drowsy. (R. 61). Additionally, he explained that he was "limited in a lot of ways" because he has difficultly grasping and lifting things. (R. 63-64). Specifically, he stated that he experienced pain while vacuuming, combing his hair, or using a screw driver, and could not lift more than three or four pounds with his right arm. (R. 63, 64). He further stated that this pain occurred on his right side even when he was only lifting with his left hand. (R. 76).

When asked how many miles he drives in a week, Mr. DiRosa replied that, depending on his son's cancer treatment schedule, he may have to drive 150 miles to take his son to treatment. (R. 66).

5

He stated that he cannot drive while on his medication, so he cannot take his medication on the days that he drives his son to treatment, and, on these days, his pain level is much higher than usual. (R. 72-74). He also explained that he struggles with every day living tasks such as "washing, getting dressed, [and] putting on socks." (R. 67). Additionally, he explained that his inability to do daily living tasks was "very depressing" and "affects [him] a lot." (R. 69). Mr. DiRosa stated that his depression made him "moody," made him unable to remember things, and made him not "want to be around a lot of people." (R. 70, 83).

In addition to his other impairments, Mr. DiRosa also stated that he has trouble walking because his left leg "blow[s] up" and swells if he does not elevate it. (R. 80-81). He explained that because of this issue with his leg, he has a hard time walking more than half a block. (R. 82).

At the conclusion of Mr. DiRosa's testimony, the ALJ inquired as to whether Mr. DiRosa's counsel wanted to call his wife in to testify. (R. 85). Counsel responded that he would like to call her in to "corroborate who does household activities and things." (R. 85). At this point, an off-the-record discussion occurred, and the VE's testimony followed, without testimony from Mr. DiRosa's wife. (R. 85).

## 2.
## The Vocational Expert's Testimony

The ALJ asked the VE, Mr. Gustafson, whether an individual limited to "light work, limited to occasional ramps, stairs and crawling; limited to no ropes, ladders or scaffolds; limited to no overhead reaching with the dominant upper extremity; need to avoid concentrated exposure to extreme cold, vibrations and hazards; limited to simple, routine tasks and limited to occasional contact with the public and coworkers" could perform any of Mr. DiRosa's past work. The VE testified that, for a similarly situated person as Mr. DiRosa, past relevant work would be ruled out

because it would exceed the "light" category. (R. 87). However, when asked if there were other jobs that such an individual could be expected to adjust to and perform, the VE stated that there are other jobs that such an individual could perform. (R. 87). He stated that a similarly situated person could perform the jobs of a hotel room cleaner or jobs in the area of production inspection. (R. 87).

If the hypothetical was changed so that the dominant upper extremity could not be used, the VE stated that there would be no jobs under those circumstances. (R. 87-88). When asked if the hypothetical was changed to a sedentary with a sit or stand option, the VE stated that the person would be able to perform the jobs of an industrial laborer and hand packaging. (R. 88). However, if there was no use of the dominant upper extremity, the VE stated that there would be no jobs. (R. 89). Additionally, having problems with concentration or having to take breaks "would add up to inadequate productivity," which could affect employment. (R. 90).

## III.
## DISCUSSION

### A.

An ALJ is required to make a complete and fair record of the hearing proceedings. 20 C.F.R. § 404.951; *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Mr. DiRosa contends that the ALJ made an "incomplete record of the proceedings" because of the off-the-record discussion that took place between the ALJ and Mr. DiRosa's counsel following Mr. DiRosa's testimony. (Plaintiff's Memorandum, at 4-5). He claims that, in this off-the-record discussion, the ALJ stated that he *believed* Mr. DiRosa, and that therefore there was "no need" for his wife to corroborate his testimony. (R. 318-19). Mr. DiRosa claims that this statement by the ALJ led him to believe that the ALJ found him credible, and caused him not to put on the corroborating testimony. (Plaintiff's Reply to Defendant's Motion for Summary Judgment and Memorandum ("Plaintiff's Reply," at 4)). It is

7

rather clear the ALJ could not have found Mr. DiRosa capable of cleaning hotel rooms if he had found his testimony credible.

Section 1-2-6-40 of the Hearings, Appeals, and Litigation Law Manual ("HALLEX") provides that "the ALJ must summarize on the record the content and conclusion of any off-the-record discussion." HALLEX 1-2-6-40. (http://www.socialsecurity.gov/OP_Home/hallex/I-02/I-2-6-40.html). The ALJ failed to do that in this case, and it is this omission which the plaintiff contends requires a reversal and remand.

The Hearings, Appeals and Litigation Law Manual ("HALLEX") is a policy manual written to convey "guiding principles, procedural guidance and information to the Office of Hearing and Appeals Staff." HALLEX, Chapt. I–1–001. Courts may look to the HALLEX as a guide for procedural rules in Social Security DIB cases. *Cf. Perkins v. Chater,* 107 F.3d 1290, 1294 (7th Cir.1997). *Baker v. Barnhart,* 2003 WL 21058544, 8 (N.D.Ill. 2003). The Seventh Circuit has not decided whether the Appeals Council's failure to follow a provision of HALLEX is reversible error. *Cromer v. Apfel* , 234 F.3d 1272, 2000 WL 1544778, *2 (7th Cir. 2000); *Murphy v. Astrue*, 496 F.3d 630, 636 (7th Cir. 2007); *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997).

The Circuits are split over whether HALLEX creates "enforceable rights" for claimants. *Davenport v. Astrue*, 417 Fed. Appx. 544 (7th Cir. 2011). *See, e.g., Lockwood v. Comm'r Soc. Sec. Admin.,* 616 F.3d 1068, 1072 (9th Cir.2010) (the HALLEX is merely a non-binding, internal administrative guide); *Ferriell v. Comm'r of Soc. Sec.,* 614 F.3d 611, 618 n. 4 (6th Cir.2010) (same); *Power v. Barnhart,* 292 F.3d 781, 785–86 (D.C.Cir.2002) (same); *DeChirico v. Callahan,* 134 F.3d 1177, 1184 (2d Cir.1998) (same); *but see Shave v. Apfel,* 238 F.3d 592, 596–97 (5th Cir.2001) (prejudicial violations of the HALLEX entitle a claimant to relief); *Newton v. Apfel,* 209 F.3d 448,

459–60 (5th Cir.2000) (same). The Seventh Circuit went on to note that no circuit has held that the HALLEX creates *constitutional* rights because, of course, only the Constitution, not an agency's rules or procedures, is the source of such rights. *See United States v. Caceres,* 440 U.S. 741, 751–52 (1979). In *Davenport*, since the plaintiff did not show that the agency violated due process, the court of appeals held that her failure to exhaust when she refused to attend her hearing defeated her claim for benefits. 417 Fed.Appx. at 547-48.

The Seventh Circuit has described the Fifth Circuit approach as "a more rigorous standard for the agency," which it is required to follow because HALLEX constitutes its own procedures that affect the rights of individual members. *Cromer v. Apfel*, 234 F.3d 1272, 1273 (7th Cir. 2000). Courts following the Fifth Circuit approach have "require[d] a showing that the claimant has been prejudiced by the agency's failure to follow a particular rule before such a failure will be permitted to serve as a basis for relief from an ALJ's decision. *Shave*, 238 F.3d at 597.

In this case, assuming Mr. DiRosa's assertions are true, he was potentially prejudiced by the ALJ's allegedly misleading statements to him regarding the ALJ's assessment of his credibility and the lack of any need of corroboration by his wife. The ALJ's failure to have documented the off-the-record discussion regarding the testimony of his wife has made judicial review impossible. Mr. DiRose said he was assured that the ALJ believed him and that his wife's corroborating testimony was unnecessary. Yet, despite that undifferentiated assurance, the ALJ then found him not credible. Perhaps he would have done so even with the wife's testimony. But one will never know. After all, "'[m]erely corroborative' evidence is many times the most probative for it may substantiate and make credible an otherwise bald and self-serving position."*Graham v. Baughman,* 772 F.2d 441, 445 (8th Cir.1985); *Hoskins v. McBride,* 13 Fed.Appx. 365, 368 (7th Cir.2001). *See Arizona v.*

*Fulminante,* 499 U.S. 279, 298–299 (1991)("Furthermore, the judge's assessment of Donna Sarivola's credibility, and hence the reliability of the second confession, might well have been influenced by the corroborative effect of the erroneously admitted first confession.").

By failing to summarize the claimed, off-the-record conversation, the ALJ has prevented a judicial assessment of the conversation and its impact on the course of the case. Any uncertainty should not favor the Commission, for it was the ALJ whose omission has caused the problem. In varying contexts, the federal courts have made clear that where a party's lawyer has been led astray by assurances by the judge, and counsel made a significant, tactical decision based on those assurances which were later ignored by the judge, reversal is required so long as the decision involved a matter of significance. *See e.g., United States v. Ienco,* 92 F.3d 564, 569-570 (7th Cir. 1996)(Posner, J.); *Fiori v. Truck Drivers, Local 170,* 354 F.3d 84, 90 (1st Cir.2004)("Still, if the judge had unfairly misled defense counsel as to the permitted scope of his closing argument, we could undo the mischief without regard to law of the case doctrine."); *United States v. 15 Bosworth Street,* 236 F.3d 50, 56 (1st Cir. 2001)("Trial lawyers pay attention to judges, and rightly so. In this instance, there is a considerable risk that the judge's comments led the claimants' attorney astray, inducing him to rest without presenting any evidence. This possibility suggests to us that, in the interests of justice, the claimants ought to be afforded an opportunity to offer evidence in support of their assertion of innocence."); *Knox v. Collins,* 928 F.2d 657, 661 (5th Cir.1991) (judge mislead counsel about instructions to be given, so defendant did not challenge jurors to whom he would have objected); *United States v. Ricks,* 802 F.2d 731, 733-34 (4th Cir.1986) (process employed resulted in defendant wasting challenges on potential jurors who would never be seated so as to deprive him of objections to seated jurors); *United States v. Turner,* 558 F.2d 535, 538 (9th Cir.1977) (method

employed by trial judge arbitrarily deprived defendant of peremptory challenges). The underlying principle of these cases applies, or should apply where an administrative law judge leads a claimant's lawyer astray by telling him that it is not necessary to call a corroborating witness because the claimant's testimony has been believed.

By failing to have summarized the off-the-record discussion that plaintiff now insists led him to conclude it was unnecessary to put on corroborating evidence, the ALJ has made meaningful review impossible. Thus, it cannot be ascertained whether the plaintiff's counsel was misled or simply made a wrong tactical decision with which he would have to live. *Crowe ex rel. Crowe v. Zeigler Coal Co,.* 646 F.3d 435, 444 (7th Cir.2011). In other cases where claims have been made that a party's counsel was misled by the judge or the ALJ, the record was sufficient to assess the claim. *See, e.g., Gimbel v. Commodity Futures Trading Com'n,* 872 F.2d 196, 201 (7th Cir.1989); *Cully v. Lutheran Medical Center,* 1987 WL 35978, 1 (6th Cir. 1987); *Fetsch v. Apfel,* 1998 WL 1780692, 3 (D.N.D. 1998)(nothing the ALJ said could have misled plaintiff's counsel into believing cross-examination of the vocational expert was unnecessary).

Here, the record is insufficient, and that is the fault of the ALJ. By not summarizing the off-the-record conversation, the ALJ failed to fully and fairly develop the record, as he was obligated to do. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Because there cannot be a meaningful judicial review, the case must be remanded, whether or not the HALLEX creates rights in the plaintiff.

A number of district courts in this Circuit have held ALJs to the procedural requirements in HALLEX. *See, e.g., Anderson v. Astrue*, 2011 WL 2416265, *11 (N.D.Ill. 2011)*; Freundt v. Massanari*, 2001 WL 1356146, *19 (N.D.Ill. 2001); *Graham v. Massanari*, 2001 WL 527326, *8

(N.D.Ill. 2001)*; Baker v. Barnhart*, 2003 WL 21058544, *8 (N.D.Ill. 2003); *Oyen v. Shalala*, 865 F.Supp. 497, 509 (N.D.Ill. 1994). *See also Betancourt v. Astrue*, 2011 WL 249881 (D. Mass. 2011). The circumstances have varied, but, most often, the concerns were over the development of the record. That is the situation here.

The government's position is that since the conversation was not on the record and was not summarized by the ALJ, it is impossible to know what happened and thus the case must be affirmed. That is an odd notion, which would lead to utterly unacceptable consequences. And we have it on the highest authority that the soundness of any conclusion may be measured by its consequences. *See, e.g., University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 194 (1990); *Florida Power & Light Co. v. United States Nuclear Regulatory Commission*, 470 U.S. 729, 741 (1985); *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007)(Breyer, J., dissenting)("Hence it is important to consider the potential consequences of the plurality's approach, as measured against the Constitution's objectives. To do so provides further reason to believe the plurality's approach is legally unsound."); Posner, Cardozo: A Study in Reputation, 118 (1990) ("'The soundness of a conclusion may not infrequently be tested by its consequences'").

If the government's theory were accepted, an ALJ could do and say anything – no matter how improper, misleading, or prejudicial – and it could never be the basis for a reversal since not having been recorded or summarized on the record, the plaintiff could never prove it occurred. That is plainly an unacceptable and indeed nonsensical result. It would eliminate the requirement that the ALJ develop the record so that there can be meaningful judicial review, and would preclude that very review which Congress deemed essential to the effective operation of the Social Security system.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED and the Commissioner's motion for summary judgment is DENIED.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: July 13, 2012